United States District Court
for the
<u>Northern District of Illinois</u>

```
FILED: JULY 17, 2008
08CV4080
JUDGE MAROVICH
MAGISTRATE JUDGE DENLOW
RCC
```

Virginia Mathie,                               )
           Plaintiff,                     )
                                          )
     v.                                    )          Civil Action No. _____
                                          )
Harris Bank N.A. and Harris                    )
Employment Transition Policy,                  )
plan #510,                                     )
           Defendants.                    )

## COMPLAINT

### I.

### PRELIMINARY STATEMENT

1. This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 [29 U.S.C. §§ 1001 et seq.] ("ERISA") for Defendants' failure to pay severance benefits to Plaintiff pursuant to the terms of the Employment Transition Policy, plan #510 in violation of ERISA § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)].

### II.

### JURISDICTION AND VENUE

2. This action arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and this court has jurisdiction over Plaintiff's ERISA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

3. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) and 29 U.S.C. § 1132(e)(2).

### III.

### PARTIES

4. Plaintiff Virginia Mathie is a former employee of Defendant Harris Bank N.A. (formerly Harris Trust and Savings Bank) ("Harris"). Harris eliminated Plaintiff's position in February 2005 at which time she became a qualified

participant in the Harris Employment Transition Policy, plan #510 ("Plan") within the meaning of ERISA § 3(7) [29 U.S.C. § 1002(7)].

5.    Defendant Harris is headquartered in Chicago, Illinois and is the sponsor of the Plan, which is funded from the general assets of Harris.

6.    Defendant Plan is a severance benefit plan sponsored by Harris and administered by the Benefits Administration Committee.   The Plan is a welfare benefit plan as defined by ERISA § 3(1) [29 U.S.C. § 1002(1)] and a separate legal entity under 29 U.S.C. § 1132(d).

**IV.**

**STATEMENT OF FACT**

7.    Plaintiff was hired by Harris in 1981.

8.    Plaintiff was employed by Harris as a full time employee until March 2006.

9.    Effective July 2004, Harris instituted the Plan, a copy of which is annexed as Exhibit "A".

10.    According to the terms of the Plan, it "addresses the process of handling general employment transitions." (Exhibit "A", 4).

11.    Employment transitions are "organizational changes [that] may include but are not limited to physical relocation or elimination of a position." (Exhibit "A", 4).

12.    Full time employees who are performing at a satisfactory level when the employment transition occurs are entitled to participate in the Plan. (Exhibit "A", 4 – 5).

13.    The Plan provides eligible employees severance pay. (Exhibit "A", 6).

14.    The Plan requires the employee's manager to notify the employee at least twelve weeks prior to the employee's position being eliminated. (Exhibit "A", 5).

15.    The employee is then usually required to look for another internal position during the twelve week period after receiving notice of job elimination. (Exhibit "A", 5).

16.    If the employee accepts another job within the organization or refuses a comparable job offered by Harris and remains without a position at the end of the job search period, the employee is not eligible for severance benefits. (Exhibit "A", 7 – 8).

17.    In approximately February 2005, Harris effectively eliminated Plaintiff's position by eliminating or reassigning the majority of her job functions.

18.    Plaintiff was performing at a satisfactory level.

19.    Plaintiff's manager did not inform her that her job was being eliminated at any time, which was in violation of the terms of the Plan.

20.    Harris did not give Plaintiff the opportunity to look for another position within the organization, which was in violation of the terms of the Plan.

21.    Harris assigned Plaintiff to a non-comparable job that required retraining, which was in violation of the terms of the Plan.

22.    Plaintiff requested training from Harris so that she could adequately perform these new tasks.

23.    Harris denied Plaintiff's request for training.

24.    In March 2006 Harris terminated Plaintiff's employment because of performance problems stemming from her inability to perform the tasks for which Harris denied Plaintiff training.

25.    On or about May 5, 2007, Plaintiff made a formal application for benefits to the Plan Administrator, identified as the Benefits Administration Committee in the Plan.

26.    In June 2007, Plaintiff received a letter from Janice Francour, Vice President, on behalf of the Harris Benefits Appeals Committee that more time would be needed to make a decision.

27.    Plaintiff did not receive a decision from either the Benefits Administration Committee or the Harris Benefits Appeals Committee within the timeframe set forth in the Plan.

28.    Pursuant to the terms of the Plan, Plaintiff appealed to the Plan Administrator on or about September 6, 2007.

29.    Later in September 2007 Plaintiff received a second letter from Janice Francour, Vice President, on behalf of the Harris Benefits Appeals Committee that more time would be needed to make a decision.

30.    Upon information and belief, the Harris Benefit Appeals Committee is comprised entirely of Harris employees.

31.  On or about November 6, 2007, Cathy Cahill, in-house counsel for Harris, submitted a written recommendation to the Benefit Appeals Committee advising that Plaintiff was not entitled to benefits.

32.  Prior to issuing this advisory opinion Cathy Cahill represented Harris as an advocate in negotiations with Plaintiff to settle her claim for plan benefits.  Said negotiation failed to produce a result satisfactory to Plaintiff.

33.  On or about November 9, 2007, the Harris Benefit Appeals Committee denied Plaintiff's request for benefits.

34.  Upon information and belief, the November 9, 2007 decision to deny Plaintiff benefits was based solely on the recommendation of Cathy Cahill.

35.  Plaintiff has exhausted her administrative remedies under the Plan.

## V.

## CAUSE OF ACTION

36.  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 33 above.

37.  Plaintiff is a participant and beneficiary under the terms of the Plan.

38.  Defendants erroneously interpreted Plan provisions in denying Plaintiff's eligibility for severance benefits.

39.  The letters informing Plaintiff that she was denied the plan benefits that she requested from the Plan Administrator were written on behalf of the Benefit Appeals Committee.  The Benefit Appeals Committee is not the Plan Administrator named in the Plan and as a result there was an improper delegation of fiduciary authority from the Benefits Administration Committee (identified in the text of the Plan as the Benefits Administration Committee) to the Benefit Appeals Committee (which is not named in the Plan).

40.  Additionally, the Plan Administrator improperly delegated decision making power to Cathy Cahill, in-house counsel to Harris who had previously acted as an advocate for Harris in this matter, or, in the alternative, the decision to deny Plaintiff benefits under the Plan was based solely on the opinion of Cathy Cahill.

41.     The decision to deny Plaintiff benefits under the Plan was in violation of the terms of the Plan and ERISA.

42.     Alternatively, the decision to deny Plaintiff benefits under the Plan was arbitrary, capricious, not made in good faith, unsupported by substantial evidence, and erroneous as a matter of law.

43.     As the direct and proximate result of Defendants' actions, Plaintiff has been caused to incur costs and attorneys' fees in an amount not currently known by Plaintiff.

44.     As the direct and proximate result of Defendants' denial of plan benefits to Plaintiff, Plaintiff has lost benefits that she is entitled to in an amount not known in full by Plaintiff but upon information and belief such loss is approximately $82,343.00.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Assume jurisdiction over this matter;

B.  Order Defendants to pay Plaintiff the amount owed to her under the Plan with pre-judgment interest;

C.  Award Plaintiff her reasonable costs and attorneys' fees; and

D.  Grant Plaintiff such other and further relief as may be proper.

Dated: Chicago, Illinois
      July 17, 2008

BANZULY & GOLDEN  LLP

By: /s/ Elizabeth M.B. Golden
Elizabeth M.B. Golden  (#6292894)
10 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
embgolden@mac.com
(312) 505-2096

# EXHIBIT

## A

BMO Financial Group

# Employee's Guide to

# Employment

# Transition

# Employee's Guide
# To
# Employment Transition

## Table of Contents

**Purpose and Intent of Guide**                                    **3**

**Employment Transition Policy**                                   **4**

**Employment Transition and Your Benefits**                        **9**

    *General Benefits*                          **9**

        Performance Ratings and Salary Increases    9
        Vacation Credit    9
        Tuition Reimbursement    9
        Harris Bank Scholarships    9
        Employee Assistance Program    9
        Banking Services    9
        Bank Property    10

    *Severance Benefits*                         **10**

        Unemployment Compensation    11
        Special Service Leave    11
        Outplacement Programs    11

    *ERISA Information*                          **11**

Effective 7/04

# PURPOSE AND INTENT OF GUIDE

This handbook spells out the Bank's Employment Transition Policy and defines the benefits available to employees involved in transition. It is intended to clarify the policy and serve as an informational guide through the transition process.

All prior handbooks related to employment transition are rescinded and superseded by this handbook. Changes in relevant laws and Bank policy may require further updates or a complete revision to this handbook. At any time, in its sole discretion, the Bank may revise, terminate or interpret the policies and benefits described in this handbook.

This guide is not a contract and does not affect the employment-at-will status. Although employee benefits are summarized in this handbook, the actual benefit plan documents contain all terms and conditions. In addition, if any discrepancies are found between the benefit provisions highlighted in this handbook and the actual benefit plan documents governing plan operations, the actual benefit plan documents rule.

Effective 7/04

# EMPLOYMENT TRANSITION POLICY

**PURPOSE:**   Change is inevitable in today's competitive environment. Successful companies make change an ally and understand the need for flexibility in the workforce. Employment transitions are based on management's need to make changes to positions for business purposes. These organizational changes may include but are not limited to physical relocation or elimination of a position.

This policy addresses the process of handling general employment transitions. The Bank reserves the right to develop alternate employment transition policies based on business needs.

**SCOPE:**   This policy applies to all full-time and part-time employees. Temporary employees are ineligible.

**DEFINITIONS:**   **Position:**   A job identified by its functional job title and associated grade level, except Nesbitt Burns which defines position only by the functional job title.

**Comparable Job:**   A position that is:
- within one grade level (up or down) of current position
- within the same shift
- within the same employment status based on hours of work without affecting benefit status (i.e. part-time or full-time)
- within 35 mile radius of current work location

Exceptions to this definition are at the Bank's sole discretion if the net impact of these factors causes an undue hardship on the employee.

**Eligibility:** Any employee with a performance rating of *"does not meet requirements"* or *"below quality"* on their last review or who is on Written Warning, Probation or Immediate Probation stages of corrective action is *not* eligible to participate under the *Employment Transition Policy.*

Employees whose positions are eliminated while they are on authorized leave or other inactive status for any reason (including long-term disability) will not receive employment transition benefits except the twelve-week job search period. However, employees who would be entitled to reinstatement

under the Family and Medical Leave Act (FMLA) or under the Uniformed Services Employment and Reemployment Rights Act (USERRA) will be eligible (provided other eligibility requirements are met) for employment transition benefits if their position is eliminated while on Family and Medical Leave or during the first 12 weeks of leave under USERRA in any one year period.

Employees whose severance or separation benefits are governed by any other individual or group policy, program or plan maintained by, or any agreement or contract with, any of the Bank of Montreal U.S. Group of Companies are not eligible for benefits under the Employment Transition Policy. In that event the terms of the other policy, program, or contract shall apply to the exclusion of this Policy.

**Selection Criteria:** If a position is currently filled by one or more employees, the criteria used to identify the person(s) to be transitioned is based on:

- the average of the last two consecutive performance ratings which may include the range of performance associated with compensation allocations and/or documented competencies for specific skills
- seniority; based on combined years of service, if applicable

Performance is given greater weight than seniority. In the event that the employees' performance ratings are equal, seniority with the Bank becomes the deciding factor. Furthermore, in situations where performance ratings and Bank seniority are equal, the deciding point will be seniority in the *unit*.

**Official Notification Date:** Notification by an employee's manager to the employee at least twelve weeks prior to the actual job transition date.

**Job Search Period:** The twelve-week minimum time frame from the official notification date given to eligible employees to find another internal position. The maximum time frame to find an internal position is based on the actual job transition date.

**Job Transition Date:** The date an employee's current position is eliminated, relocated or restructured due to an organizational change. This date is also known as the *Completion Date* and is considered the last day the employee is on the Bank's payroll.

**Severance:**  Payment provided to those eligible employees whose employment ends due to organizational change. Severance is calculated using an employee's rehire date not original hire date and is based on an employee's full or part-time status as of the official notification date.  The maximum severance payout is not to exceed a total of 104 weeks.

**Severance Profile:**  Data sheet containing employee information and calculations used to determine severance benefits.

**Separation and Release Agreement:**  An agreement signed by the employee that settles and releases any and all claims an employee may have arising from employment or termination of employment.

**KEY POINTS:**

**A.** An employee who does not meet the eligibility requirements of the *Employment Transition Policy* will be terminated from the Bank *without* severance benefits as of the official notification date.

**B.** Employees eligible for participation under the *Employment Transition Policy* will be given a minimum of twelve weeks (job search period) to find an internal position.  If Employee Relations and the manager agree that no opportunities exist for an internal job search, the employee will receive severance benefits on the next regularly scheduled payday following their completion date.

**C.** Managers determine whether an employee must remain employed during the job search period in order to receive severance benefits.  If the manager does not require the employee to remain during the job search period, the employee has the option of leaving immediately and receiving severance benefits (exclusive of the job search period) or conducting an internal job search.

However, if a manager requires an employee to remain employed through the job search period and the employee voluntarily resigns, the employee is *not* eligible for severance benefits.

**D.** If an employee registers for a course prior to the notification date, the employee is entitled to tuition reimbursement for that course provided that all other

reimbursement requirements are met. Likewise, severance-eligible employees who have taken courses within the past two years will not be required to repay any tuition reimbursement.

An employee who enrolls in a class subsequent to the notification date is *not* eligible for tuition reimbursement **unless the employee is offered and has accepted another** position within the Bank during the job search period.

### E. During the Job Search Period

- If an employee accepts another job within the Bank during the job search period, the employee will *not* be eligible for severance benefits.

- If an employee accepts a comparable job in the Bank with a lower grade level and his/her current salary is above the new job's maximum, the employee's current salary may be frozen for up to two years. At the end of the two years, if an employee's salary remains above the maximum for the grade, it will be lowered to the maximum for the new job.

- If an employee accepts a *non*-comparable job, it is with the understanding that the employee also accepts the salary offered by the manager (which cannot exceed the maximum of that grade level) and any other benefits and/or title changes that may occur.

- If an employee rejects a comparable job offer with the Bank, the employee may continue looking for a position through the end of his/her job search period.

### F. At the End of the Job Search Period

- If a comparable job within the Bank has been offered but rejected by the employee and the employee still remains without a job at the end of the job search period, he/she will be terminated *without* severance benefits.

- If an employee has *not* been offered a comparable job within the job search period and has not accepted any other job within the Bank, the employee will be terminated *with* severance benefits. Additionally, the employee is offered the services of an

Effective 7/04

outplacement firm.

**G.** An employee receiving severance benefits under the *Employment Transition Policy* will be required to sign a *Separation and Release Agreement* prior to receiving those benefits. An employee who refuses to sign the *Separation and Release Agreement* will ***not*** receive severance benefits.

**H.** An employee who terminates with severance benefits and is rehired by the Bank within twelve months of the termination date may be required to repay the Bank all or a portion of the severance benefits.

Effective 7/04

# EMPLOYMENT TRANSITION AND YOUR BENEFITS

## GENERAL BENEFITS

### Performance Reviews and Merit Increases

Performance reviews and merit increases continue, as normal, during
the employment transition process.

### Vacation Credit

In the event that the employment transition results in termination,
employees will receive accrued vacation credit based on the vacation
schedule for the month of termination less any vacation time already
taken. If the transition results in retirement, employees receive the
full annual vacation entitlement less any vacation time already taken.
Refer to the *Vacation Policy* for further information.

### Tuition Reimbursement

An employee is eligible for tuition reimbursement provided all
reimbursement requirements are met and the employee registered for
the course *prior* to the notification date. The original course report
card must be submitted within four weeks of completing the class to:

> Institute for Learning
> Harris Bank, 111/8E
> PO Box 755
> Chicago, IL 60690

Severance-eligible employees who have completed undergraduate or
graduate-level courses or who have taken specialized programs
within the last two years will *not* be required to repay the Bank for
those classes taken.

### Harris Bank Scholarships

Scholarships awarded to children of transitioned employees will be
honored for the calendar year in which the employment transition
occurs.

### Employee Assistance Program (EAP)

You and your immediate family may continue to use the EAP until
your termination date. If you are currently using the program,
please contact the EAP office for information on post termination
consultations.

### Banking Services

You may continue to use your employee checking account without

Effective 7/04

incurring routine administrative expenses through the statement cycle following your termination date. If you choose to keep your account at the Bank, it will be transferred to a customer status and will incur the normal fees. Retirees, however, may continue to receive free checking account services.

Any Harris mortgage, installment loan, or line of credit acquired as **an employee will retain the employee interest rate until the loan is** paid or renewed. Annual fees will not be charged until the renewal date following termination. An employee mortgage acquired through the Bank of Montreal must be repaid within 30 days; otherwise the loan reverts to the current customer interest rates.

Discounts provided on other banking services will no longer apply after the termination date.

### Bank Property

Bank property, including Bank PCs, cell phones, pagers, keys and ID cards, must be returned to the manager by the termination date. Bank records, files and customer lists may not be removed from the Bank. Access to Bank operating systems and voice mail will be canceled by the manager as of the termination date.

## SEVERANCE BENEFITS

### Severance Eligibility

Severance provides financial support to eligible full- and part-time employees whose employment ends due to business needs. Employees *not* eligible for severance benefits are those who meet one or more of the following descriptions:

- resign or retire prior to the actual job transition date, unless commitment to remaining through the job transition date is not required by management.
- terminate for reasons other than employment transition.
- accept another job within the BMO U.S. Group of Companies.
- reject a comparable job within the BMO U.S. Group of Companies.
- refuse to sign the *Separation and Release Agreement*.

Your severance benefit and payment terms will be detailed in a *Severance Profile* provided by Employee Relations or your Human Resources Business Partner.

The maximum combined payout (search period and severance pay) is not to exceed a total of 104 weeks.

Effective 7/04

### Unemployment Compensation

In addition to your severance package, you may be eligible for up to 26 weeks of unemployment compensation provided through the state in which you work. If you choose to file for unemployment compensation, do so as soon as possible following your termination date to ensure your payments begin promptly. While you are **receiving unemployment compensation, you will be required by the** State to demonstrate that you are actively looking for work.

### Special Service Leave

If you are either 53 or 54 years of age with 23 years or more of service, you may qualify for special service leave. This is an unpaid leave of absence that will bridge your time until retirement eligibility. Refer to plan details for further information on the benefits available under this leave.

### Outplacement Programs

Outplacement services are provided to all severance-eligible employees unable to find a position within the Bank. Upon your termination, Employee Relations or a Human Resources (HR) Business Partner will discuss the outplacement assistance available. You will be given up to 90 days from your termination date to begin your outplacement program which is coordinated through Employee Relations or your HR Business Partner.

## ERISA INFORMATION

### Policy Administration

Severance benefits under this Policy are administered by the Benefits Administration Committee ("Administrator"); provided, however, that the Administrator does not administer that part of the Policy relating to an employee's selection for job elimination. The Administrator is also the agent for service of legal process. The Administrator's address is:

Harris Trust and Savings Bank
Attn: Human Resources – 7W
111 West Monroe Street
Chicago, Illinois 60603

The Administrator shall have the discretionary authority to carry out all actions necessary for the administration of the Policy with respect to Severance benefits. The Administrator shall have power and discretion to construe any disputed or ambiguous terms, determine all questions relating to the administration of

Effective 7/04

the Policy including eligibility for Severance benefits and the amounts payable, and the authority to review and resolve all claims for Severance benefits. All decisions by the Administrator shall be final and binding on all employees and their beneficiaries. The Administrator shall have the authority to delegate to others, including Bank employees, certain aspects of the administration of the Policy.

## Claims Procedure

If an employee believes s/he is entitled to a benefit under this Policy, including one greater than that initially determined to be due, the employee should file a written claim with the Administrator in accordance with this section. Within 90 days after receipt of the claim, the Administrator will notify the employee in writing. If the claim is denied, the written notice will state the reason for the denial and what additional information is needed, if any, which could change the decision to deny the claim. The notice will also state how the decision can be reviewed. In some cases the Administrator might need more time. If this happens, the employee will be notified that an additional 90-day period is required.

If the claim has been denied, or if the employee has have not heard anything within 90 days, the employee can appeal the denial and have the claim reviewed. The appeal should be sent in writing to the Administrator. The employee has 180 days to appeal from the time s/he is notified of the denial (or from the end of the original 90-day period if the employee has heard nothing by that time). The employee or his/her authorized representative can examine the plan documents related to the claim. The employee can also submit, in writing, reasons why the employee thinks the claim should not be denied. The Administrator will normally respond within 60 days after receiving the appeal. In special cases, the Administrator may advise that an additional 60 days will be required to review the appeal. The notice will include specific reasons for the Administrator's decision and references to provisions of the Policy on which it is based. The decisions of the Administrator shall be final and binding on all employees and their beneficiaries.

An employee cannot pursue any legal action for benefits unless s/he has exhausted the claims appeal procedure.

## Type of Plan

The Policy as it relates to the provision of severance benefits is a welfare plan under the Employee Retirement Income Security

Effective 7/04

Act of 1974, as amended (ERISA). The Policy plan text and the summary plan description are one and the same document.

## Plan Sponsor

The Plan Sponsor is Harris Trust and Savings Bank, Human Resources – 7W, 111 West Monroe Street, Chicago, Illinois 60603 (312) 461-2121, Employer I.D. No. 36-1194448.

## Plan Number

The Plan's number is 510.

## Plan Funding

Benefits are paid from the general assets of the Plan Sponsor.

## Statement of ERISA Rights

As a participant, an employee is entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides all Policy participants certain rights as follows.

## Receive Information About The Plan and Benefits

Examine, without charge, at the Administrator's office and at other specified locations, such as worksites, all documents governing the Policy, and a copy of the latest annual report (Form 5500 Series) filed with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, upon written request to the Administrator, copies of documents governing the operation of the Policy, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Policy's annual financial report. The Administrator is required by law to furnish each participant with a copy of this summary annual report.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who administer the Policy, called "fiduciaries," have a duty to do so prudently and in the interest of the Policy participants and beneficiaries. No one, including the employer, or any other person, may fire or otherwise discriminate against an employee to prevent the employee from obtaining a welfare benefit or exercising rights

under ERISA.

## Enforce Your Rights

If a claim for a welfare benefit is denied or ignored, in whole or in part, an employee has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps an employee can take to enforce the above rights. For instance, if the employee requests a copy of Policy documents or the latest annual report and does not receive them within 30 days, the employee may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If the employee has a claim for benefits which is denied or ignored, in whole or in part, the employee may file suit in a state or Federal court. If it should happen that Policy fiduciaries misuse the plan's money, or if an employee believes s/he is discriminated against for asserting rights, the employee may seek assistance from the U.S. Department of Labor, or may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If the employee is successful the court may order the person sued to pay these costs and fees. If the employee loses, the court may order the employee to pay these costs and fees, for example, if it finds the claim is frivolous.

## Assistance with Your Questions

An employee should contact the plan administrator with any questions. If the employee has questions about this statement or about his/her rights under ERISA, or needs assistance in obtaining documents from the Administrator, the employee should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. An employee may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.